Good morning, your honors. My name is Morgan Russell. I represent petitioner Satnam Singh. The court should grant the petition for review because the BIA's adverse credibility determination is not supported by substantial evidence, but instead is supported only by mischaracterizations of the record in this case. The BIA upheld only one of the IJ's bases for his adverse credibility determination below, and the BIA's sole basis for upholding the adverse credibility determination was that there was an inconsistency between Mr. Singh's testimony on direct and cross regarding the gender of a head physician who treated him for injuries after his arrests and beatings in India. However, each factual premise of the board's reasoning mischaracterizes the testimony on direct and is not supported by the record. The BIA stated that on direct, Mr. Singh described the doctor as a male. That's just not true. At the pages cited by the board, there is no description or statement that the doctor is a male. The only ---- Kagan. Did you argue to the board that in fact there were translation errors that caused this error in credibility determinations? So the brief to the board was done, wasn't done by my office. And it doesn't specifically raise that issue. I don't think exhaustion is a problem here, though. The board's reasoning is clearly before this Court, as this Court has held, if the board any grounds relied upon by the board are before the Court and are exhausted. I think also if we were trying to raise now for the first time an independent due process claim based on bad interpretation or problems in the interpretation, there could be an exhaustion problem there. I think the issues with interpretation that we raise in our brief to this Court is just sort of a subset and a component of the credibility issue. And credibility is clearly before the Court. Wouldn't the credibility determination that the I.J. made subsume an analysis of the translator's performance since the I.J. was the one there and in the best position to assess all of that? I'm not sure I understand. Well, if they made a credibility determination, right? The I.J. did, yes. The I.J. was there and had the translator there, correct? Yes. So wouldn't the credibility determination actually include an assessment of the translator's performance? Well, it doesn't. Instead, the I.J. ignored the various instances of problematic translation. And I think that, you know, we cite in the brief a number of instances, and a number of instances of problematic translation occur in the very sort of key passages that the Board relies on in support of its adverse credibility determination. I think, you know, there's a number of statements even by the interpreter sort of purportedly translating into English that I think at best could fairly be described as broken English, including, for example, sort of the first instance where on cross-examination he does actually describe the doctor as a female, which is the first time a specific statement as to her gender comes up, instead of just the interpreter's use of the pronoun he or she. That's at page 154 of the record. The interpreter states, speaking for Mr. Singh, the men had, the men had, is a female, Sulochana Karangia, and other people work under her. I think the transcript is full of sort of translations like this into very broken English that I think under this Court's precedent support being especially dubious of the adverse credibility determination here, especially where it's based on such a weak and, in fact, nonexistent inconsistency that really just mischaracterizes the interpreter's use of a pronoun as if it were Mr. Singh stating at some point on direct examination this was a male doctor. You know, it's not as if when asked to describe the doctor he said, oh, he's a man, he has a beard, etc., etc. He wears a turban. In fact, he says the opposite. He says he doesn't wear a turban. He doesn't say anything about gender other than the interpreter's use of the pronoun he or she. Well, the question was did he wear a turban? The answer was the men, the men had, is a female. Right. Exactly. And then said the doctor's name and other people work under her. He used the term him and her interchangeably. Right. And I think, you know, even aside from, you know, even if the Court were to decide that there was some sort of exhaustion issue in terms of the argument we raise about looking at other aspects of the record for interpretation problems, I think even specifically on this, you know, issue of gender, which is certainly before the Court, I think grave concerns that back up our argument are raised by the fact that even after Mr. Singh has specifically testified that it's a woman and clarified that, the interpreter then goes back to using he and she interchangeably, which I think, you know, makes clear that the fact that on direct there's no description of him as a male. And so the Board's assertion that he stated that or described the doctor as a male on direct is just not true. And because, you know, it's a misstatement of the record, it's a misstatement of his testimony, and that's not substantial evidence under this Court's precedent. I think, you know, the only other – I think really the gender issue is the only actual basis on page 4 of the record of the BIA's decision for its determination. On page 3, when it's sort of running through its account of the facts, it also mentions this notion that he stated on direct that he only saw or was treated by with a one-head doctor, Dr. Karangia. And then on cross, he changes his story and says that he was also treated by people who assisted her. That's also just a misstatement of the record. He mentions the fact that there was one-head doctor with people working below her, both on direct and on cross. Even if we get past the credibility determinations and the repeated statements this Court has made about the IJs being in the best position to make credibility determinations, so we get past that issue, how do we deal with the fact that there was an alternative finding that there were many places in the country where there would not likely be any problem with respect to persecution? There is no alternative finding before this Court. The IJ made an alternative finding on the merits, but the Board specifically in footnote 1 of its decision, page 4 of the record, said it didn't reach that. Under this Court's precedent, that means that there's no alternative finding before the Court. It's the BIA's decision that this Court's reviewing, not the IJ's, especially whereas here the Board has reviewed the IJ's credibility determination for clear error and did not say that it adopted or affirmed the IJ's decision. And I guess I'm just trying to determine whether or not this is an exercise in futility if we send it back and it's likely to end up in the same place. Well, I don't think we can speculate as to what's likely. If it goes back, then there will have to be a new analysis by the agency. The Board can remand to the IJ for further finding on that issue. If it, you know, it may well, we just don't know. The Board may well have felt that there wasn't substantial, there wasn't a basis for the IJ's alternative finding. We don't know whether they declined to reach that just because they didn't want to take the time or because they thought it was problematic on the merits. But either way, that's something for the agency to sort out on remand. Thank you, counsel. Thank you. Good morning. May it please the Court, I'm Sharon Clay for the government. The Board's dismissal of petitioner's asylum application for lack of credibility was proper because it was supported by substantial evidence, substantial evidence being inconsistencies that go to the heart of his particular claim for asylum. As properly noted by the Board, petitioner was unable to provide a consistent account of who provided his medical treatment. Because this inconsistency called into question petitioner's alleged mistreatment in India, it alone is sufficient to provide substantial evidence to support his adverse credibility finding. I don't really understand your waiver argument or exhaustion argument. I mean, the Board precisely said that he pointed out that during the course of the transcript, he said, I think maybe I'm not being understood or maybe I'm not understanding  Wasn't there at least consideration by the Board of this possible misunderstanding? Yes. I mean, there is consideration. If you look at the full transcript and not just the section that opposing counsel refers to, which is during cross, during direct, petitioner was specifically asked who treated him when he went to the clinic. He specifically said, I was treated by Dr. Karangia. On cross-examination, when he was asked who treated him, he said, I was not treated by her. I was treated by another particular physician. When he was given an opportunity to explain this discrepancy, he actually said, well, initially his response was not that he misunderstood. He initially said that he thought he was asked who treated him. The fact that he said he thought he was asked who treated him suggests that he understood the question because that's exactly the question that was presented to him. His own counsel, if you refer to pages 122, 129 to 133, you'll find that there was never a question about the petitioner's gender. I think the question was one of exhaustion, not on the merits. In other words, you've argued that we can't consider mistranslation in this petition for review because it's not exhausted. Correct. I think the question was the Board did reference the fact that he hadn't understood what the immigration judge had said. So given the fact that the Board had treated that issue, I think it's probably proper before. So I think the question was to hear your response on the exhaustion question, not on the merits. We understand you can get back to the merits, but you've argued it's not exhausted. Well, we would argue that it hasn't been really exhausted, but to the extent that this Court finds that it was exhausted, I would direct you to the record that would actually belie that particular claim. The inconsistencies or misunderstandings that are in the record appear to be. Oh, is it exhausted or not? We're saying it's not exhausted. And why? The petitioner did not raise it before the Board on appeal, and although the Board made a reference to the transcript, he wasn't essentially putting his full weight on whether or not there were translation errors in the document. So we have some case law that says that you have, in terms of address credibility, that the agency must be sensitive to the possibility of mistranslation. And we've raised that. Those issues have been raised in the context of an adverse credibility review. So generally speaking, that type of issue may or may not need to be exhausted. I will grant you that if this were a procedural due process question, it's unexhausted. So I just want to give you an opportunity to amplify your exhaustion argument. Well, the immigration judge, who is in the best position to know whether there was an issue, actually they were just confused. The record clearly shows that there was some misunderstanding. The immigration judge was quite confused. Yes, the immigration judge was confused. But the confusion was not during direct examination. The confusion occurred after Petitioner came in after recess and changed his testimony and asserted that Dr. Karangia was a female. And essentially he was a male. Well, he didn't say male specifically. I'm sorry, he didn't change. He referenced, he used masculine pronouns to describe the doctor. He also used feminine during the same series of questions. He used both. Well, he did, but he did the feminine references during cross-examination. There were no feminine references during the direct examination. The actual recess took place approximately around the administrative record around page 149. The confusion doesn't appear until 154, clearly after Petitioner has now alleged that the doctor is a female. But didn't he explain that Dr. Karangia was the head doctor at the clinic and that there were other people who assisted her who were male? I mean, so that if the question is, you know, you've been to a lot of doctors' offices. If the question is who treated you, it could be multiple answers. It could be, but he was adamant that it was Dr. Karangia during direct examination. There was no hesitation. He clearly said that that was the person who treated him. He spelled the doctor's name. I was treated by Karangia, K-A-R-A-N-G-I-A. He said that he only saw Karangia because he knew them, because he knew him, and because his office was in Pati, like wherever the area was. So there was some level of familiarity he was expressing is the reason why he attended this clinic and he was treated by this particular doctor. Now, all of a sudden, on cross-examination, he's claiming, no, I wasn't treated by somebody else. I mean, I wasn't treated by Karangia. I'm treated by Jagtar Singh. Whoever Jagtar Singh was not, he was not raised before. I would also like to highlight, too, one of the things that the direct examination shows is that he was directly asked the first name of the doctor who treated him, and he said he did not know Dr. Karangia's name. On cross-examination, the first thing he did after recess was blurt out her first name. So during the course of his testimony, he goes in and he says, I don't know who this person is. I don't know the person's first name. Now, all of a sudden, the person's female and I know her name. The presumption that I.J. took at that time was that during recess, he must have looked at his evidence, and during cross-examination, he was just trying to change his testimony to reconcile his testimony with the evidence. Was he asked how he remembered her name? No, he was not asked. But he did say he didn't know her name, clearly, during direct examination. And as soon as he came back, he was able to produce her name, Solange, Solange or whatever her name is. I can't remember her name. So I would suggest that that, in addition to the fact that there's no other evidence in the record aside from the letter that has been raised as questionable, that his mistreatment or his treatment by the doctor is not credible. Do you agree that if we reverse the credibility determination that we would need to remand for further consideration? If you reverse the credibility, yes. I do believe that you would have to remand for further consideration because the board kind of hung its hat on one credibility issue, and if that has been, if that is overturned, then I would assume that there would be further consideration for other matters. But personally, based on the record, I don't see how it would actually change the end result. I mean, Petitioner filed a declaration of harm in India. He didn't say that he was treated at a hospital. The affidavits that he supported to substantiate or support his claim that he was mistreated did not include any mention of having gone to the doctors. The only thing that he had was this one single document, and I don't see how that's actually going to change anything because that document has been called into question due to the anomalies in the letterhead. But the board didn't make any findings on that? No, the board did not make any findings on that, but if it goes back to the immigration judge, based on this record, they could ultimately make that finding, and it would just come back up through with the same result. That being said, getting to Petitioner's CAT claim, the CAT claim fails because Petitioner has failed to point to any evidence, aside from his discredited testimony, to show that he would be likely to be harmed if he's returned to India based on his participation in the Mann Party. The specific evidence in the record that Petitioner has pointed to with regard to his CAT claim actually shows that Mann Party members aren't ill-treated anymore based on their political activities, but rather if they engage in terroristic activity. But the board made no findings on that, right? Well, the board agreed with the immigration judge's finding that there's no independent evidence outside of Petitioner's discredited testimony to demonstrate that he's likely to be tortured upon his return to India. Well, you say there's no evidence outside of the discredited testimony, but if we find that the discredited testimony was improperly discredited, then what? Then you would probably have to remand to send it back for a reevaluation on a CAT claim because there's not a lot that the board has actually said in its own decision, other than he points to no independent evidence that would substantiate his claim. One other question. Can you tell me what page the recess was taken? I think it was administrative record page 149. The confusion started around page 154. The specific parts of the direct examination that show clearly he knew who he was referring to and that that was the only position he saw was on pages 129 through 33, I believe, and page 122. Thank you, counsel. Or do you have a question? Thank you. Thank you. Your Honor, it's just a few points in rebuttal. First, the issue of the doctor's name, him not being able to remember her first name on direct and being able to remember it later, is not before the court. The court can't sustain the BIA's adverse credibility finding on that basis. It wasn't an inconsistency identified or relied upon by either the IJ or the BIA. And so this Court can't sustain the BIA's decision on a basis that the BIA itself didn't state. Similarly, the document, the issues with the letterhead, the doctor's letterhead, the IJ did rely on, but the BIA did not, and so that's also not before the court. The BIA didn't adopt that basis, probably for good reason, because under this Court's precedent, this Court generally holds that it's impermissible speculation for an IJ without a solid basis and experience to speculate about the authenticity of foreign documents and that typos aren't generally a basis for an adverse credibility determination. I disagree that Mr. Singh was adamant on direct, as Bozeng Counsel stated, that he'd only been treated by the head doctor, Dr. Karangia. At page 131 of the record, the IJ interceded on direct to ask, so you only saw Dr. Karangia? Mr. Singh's response is, besides there are other people who work under him, do you happen to know who those other people are? Those who work for him, they're his employees. Are they also doctors? Like you say, call them nurses or doctors. That description of there being a head doctor and other staff where he was treated is consistent with his testimony on cross. Thank you. Thank you, Counsel. The case is to argue and be submitted for decision. Thank you both for your arguments.
judges: Reinhardt, Thomas, O'Malley